BRIAN F. CURLEY, ESQ. (9103)
35 Airport Road, Suite 330
P.O. Box 1314
Morristown, New Jersey 07962-1314
(973) 538-0700
Fax (973) 270-2441
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE CELLULAR SIGNAL PLUS, INC., GABE AND MARTA BRAVO,<br><br>Plaintiffs,<br><br>vs.<br><br>BRIAN MCALINDIN, JORI MCALINDIN, ROBERT ANZALONE, THE CELLULAR SIGNAL, INC., a corporation of the State of New Jersey, SCOTT STEIN, JOHN AND JANE DOES 1-50 (fictitious), ABC CORPORATIONS 1-10 (fictitious).<br><br>Defendants. | Hon.<br><br>Civil Action No.<br><br>**COMPLAINT AND JURY DEMAND** |

PlaintThe iffs Cellular Signal Plus, Inc., and Gabe and Marta Bravo, (collectively referred to hereinafter as “Plaintiffs”), by way complaint against the Defendants state as follows:

**STATEMENT OF THE CLAIM**

Plaintiffs bring this action to seek redress for damages suffered by the fraudulent and illegal conduct of the Defendants which caused the Plaintiffs to lose the valuable business they built under the common laws of the State of New Jersey, and for a threshold determination whether certain actions of the Plaintiffs’ were in violation of Federal Law and thereby justified the Defendant’s later actions, or if the Plaintiffs were not in violation of Federal Law, and thereby the Defendants actions were a violation of applicable law.

**JURISDICTION AND VENUE**

1. This Court has original jurisdiction to hear and adjudicate the claims stated herein under the Communications Act of 1934, 47 U.S.C. § 151, *et. seq.*, and specifically at 47 U.S.C. § 222, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 251 *et. seq.*, and the Customer Proprietary Network Information ("CPNI") Regulations promulgated thereunder by the Federal Communications Commission ("FCC"), in particular by way of the 2007 CPNI Order issued by the FCC, FCC 07-22. The interpretation and application of the cited telecommunications statutes and regulations are the key issue in determining whether the Plaintiffs acted in a manner consistent with their obligations at law and thereby the actions of the Defendants were contrary to law. Plaintiffs' valuable business and franchise as a distributor of cellular phone services and equipment through AT&T on the basis that their actions did not comport with the statutory and regulatory requirements. As such, Plaintiffs seek adjudication of the application of the cited telecommunications statutes and regulations under the Federal Declaratory Judgment Act 28 U.S.C. § 2201-2202.

2. This Court has supplemental and pendent jurisdiction over the Plaintiffs' other state common-law claims arising from the same operative facts pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this District by reason of 28 U.S.C. § 1391(b).

**THE PARTIES**

4. CSP is a corporation of the State of New Jersey which was formerly engaged in business as an authorized franchisee of AT&T Mobility II, LLC (hereinafter "AT&T Wireless") for the purpose of marketing and selling wireless phone equipment and services from its (former) location at 413 King George Road, Basking Ridge, County of Somerset, New Jersey (hereinafter the "Premises").

5. Plaintiffs Gabe and Marta Bravo (hereinafter the "Bravos") are husband and wife, and were and remain at all times relevant hereto the principal owners of Plaintiff CSP.

6. Defendant Brian McAlindin ("Mr. McAlindin"), upon information and belief residing at 1726 Bay Boulevard, Point Pleasant Beach, New Jersey 08742, was at all times relevant hereto the husband of Defendant Jori McAlindin.

7. Defendant Jori McAlindin ("Mrs. McAlindin") upon information and belief residing at 1726 Bay Boulevard, Point Pleasant Beach, New Jersey 08742, was at all times relevant hereto, the wife of Defendant Brian McAlindin.

8. Defendant The Cellular Signal, Inc. ("TCSI") is a corporation of the State of New Jersey, for which Defendant Robert Anzalone ("Anzalone") is a principal owner, shareholder, or officer.

9. TCSI currently operates a retail cellular phone business from Premises at 413 King George Road, Basking Ridge, County of Somerset, New Jersey.

10. If the business operations being conducted from the Premises are not being conducted by Defendant TCSI, but by another business entity, then Plaintiffs plead that entity under the rules governing the pleading of fictitious entities, as ABC Corporation #1 ("ABC Corp. - 1") pending identification of the entity in the course of the litigation.

11. TCSI, or alternatively ABC Corp. – 1, was formed and/or operated for the express and illicit purpose of arrogating the business opportunities, customers, and goodwill of Plaintiff CSP.

12. Defendant Robert Anzalone ("Anzalone") is a principal, owner, shareholder, or officer, of Defendant TCSI or ABC Corp. -1.

13. Defendant Anzalone, individually and/or in his capacity as a principal, owner, shareholder, or officer, TCSI or ABC Corp. - 1, orchestrated the actions that led to claims alleged herein against Anzalone/TCSI/ABC Corp. -1.

14. Defendant Scott Stein ("Stein"), is an individual who upon information and belief is a former AT&T employee who acted outside the scope of his employment by conspiring with Defendant Mrs. McAlindin to report false information concerning CSP and Mr. Bravo in respect of claims asserted herein.

15. ABC Corporations 2-10 and John and Jane Does 1-10 are fictitious parties who assisted or aided and abetted the actions of the named Defendants and who will be pled with specificity at the appropriate time after they are identified with precision in the course of the litigation.

## FACTS COMMON TO ALL COUNTS

16. The core events relevant to the claims occurred in 2009, by which time Mr. and Mrs. Bravo had been operating a retail cellular phone store for many years, first for Cingular Wireless, then for AT&T after the merger of AT&T and Cingular.

17. Over their many years operating as an authorized cellular phone dealer, Mr. and Mrs. Bravo had invested a great deal of capital, time, and energy, into building CSP's cellular phone business and by 2009 had achieved a high degree of success in shaping their business to establish a solid base of customers and goodwill in both the retail and business distribution channels.

18. By way of a Franchise Agreement effective December 1, 2007 (hereinafter the "Franchise Agreement"), AT&T granted the CSP exclusive dealer rights to market and sell certain AT&T wireless equipment and services at the Premises location.

19. By September 2009, Mr. and Mrs. Bravo had built CSP into consistently profitable business with excellent customer ratings and retention within the AT&T Wireless dealer networks.

20. Prior to September 2009, Mr. McAlindin had known Mr. Bravo for many years, and Mr. and Mrs. McAlindin were socially acquainted with Mr. and Mrs. Bravo.

21. Prior to September 2009 Mr. and/or Mrs. McAlindin maintained at least one account with AT&T Wireless (hereinafter the "McAlindin Wireless Account" or alternatively the "Account").

22. Part of CSP's responsibilities as an authorized AT&T Wireless dealer were to provide account services to existing AT&T Wireless customers, and CSP derived fees for assuming responsibility for AT&T Wireless customers who selected CSP as their designated dealer for account services.

23. Prior to September 2009, Mr. McAlindin arranged to have CSP designated the servicing dealer for the McAlindin Wireless Account.

24. At the time of the transfer of the McAlindin Wireless Account to CSP and all times thereafter until sometime in the summer of 2009, Mr. McAlindin was a person authorized to access the Account records or make changes to the Account.

25. Mr. McAlindin regularly paid the monthly account charges for the McAlindin Wireless Account through his American Express Account.

26. After Mr. McAlindin designated CSP as the authorized dealer for the McAlindin Wireless Account, from time-to-time Mr. McAlindin contacted Mr. Bravo, or other CSP employees, regarding questions and other issues involving the Account.

27. Mr. McAlindin's activities with respect to the McAlindin Wireless Account were done with the knowledge and approval of Mrs. McAlindin through at least July 2009.

28. After the transfer of the McAlindin Wireless Account to CSP, Mr. McAlindin arranged for the establishment of cell phone service and issuance of a cell phone with texting service to the McAlindin's teenage daughter.

29. The issuance of the cell phone and service to the McAlindin's daughter was done with the knowledge and approval of Mrs. McAlindin.

30. On September 8 & 9, 2009, Mr. McAlindin contacted Mr. Bravo to request information related to the McAlindin Wireless Account.

31. Mr. McAlindin represented that he had not for several months seen a paper bill for the McAlindin Wireless Account and was concerned about why he was no longer receiving the paper bills and why his American Express Account was being charged very high amounts.

32. Mr. McAlindin represented to Mr. Bravo that he wanted copies of billing records for the McAlindin Wireless Account out of concern for the amounts being billed, as well as concern as a father that his teenage daughter might have been misusing the texting service or become involved in some other illicit behavior to the detriment of her safety or well being.

33. Inasmuch as Mr. Bravo had known Mr. McAlindin as a friend for approximately 40 years and recognized him on the phone and that Mr. McAlindin had contacted Mr. Bravo on his private cell phone which he did not routinely give out, Mr. Bravo told Mr. McAlindin he would look into the requests.

34. Mr. Bravo thereafter assigned an employee to review the account charges and activity to ensure the texting feature was not being abused.

35. Upon investigation it was discovered that the McAlindin Wireless Account had been changed some months earlier to a "paperless" account whereby bills would not be mailed in the traditional sense, but rather sent by email.

36. The electronic customer account system then in use by authorized dealers such as CSP in September 2009, did not readily indicate any changes to the McAlindin Wireless Account, or changes to the account.

37. At the time Mr. Bravo/CSP accessed the McAlindin Wireless Account, there was no password required to access the Account, nor anything else that objectively indicated to Mr. Bravo/CSP any restrictions or changes to the McAlindin Wireless Account, nor anything else to indicate that Mr. McAlindin was no longer an authorized person as he had been from the time the Account transferred to CSP.

38. On or about September 10, 2009, Mr. Bravo obtained billing records pursuant to Mr. McAlindin's request and forwarded billing records to Mr. McAlindin by email.

39. Mr. McAlindin falsely and fraudulently misrepresented his reasons to Mr. Bravo for seeking to obtain copies of the McAlindin Wireless Account billing records.

40. Unknown to Mr. Bravo, Mr. McAlindin really wanted the billing records to confirm that his wife was having an extra-marital affair, wanted to track her cell phone use and locations, and misrepresented himself and his intentions to Mr. Bravo to obtain the records.

41. Mr. McAlindin later confronted his wife with the cell phone billing records he obtained from Mr. Bravo, then about the extra-marital affair, and later confirmed that she was conducting the extra-marital affair with Defendant Stein, who, upon information and belief, was at the time was employed by AT&T Mobility in a position of significant responsibility.

42. In a particularly tense encounter, Mr. McAlindin confronted Defendant Stein and his wife in the middle of the day during working hours, in the parking lot of the Brielle Yacht Club, which escalated the animus between Mr. and Mrs. McAlindin.

43. After Mrs. McAlindin learned that Mr. Bravo had provided Account billing records to Mr. McAlindin, on or about September 11, 2009 Mrs. McAlindin called Mr. Bravo and threatened Mr. Bravo by stating she was "going to take him down" or words of similar import.

44. Mrs. McAlindin thereafter made false reports to AT&T with respect to the access of the McAlindin Wireless Account by Mr. Bravo/CSP, by asserting to the effect that Mr. Bravo/CSP had accessed her account in violation of AT&T Wireless policies and applicable law, none of which Mrs. McAlindin could have known on her own and (presumably) without assistance and prompting from Mr. Stein.

45. On or about September 15, 2009, Mr. Bravo was contacted by representatives of AT&T Wireless about his retrieval of billing records for the McAlindin Wireless Account at the request of Mr. McAlindin.

46. Upon information and belief, Mrs. McAlindin continued her fraudulent efforts to cause AT&T to believe that Mr. Bravo had done something improper by providing Account billing records to her husband Mr. McAlindin.

47. Upon information and belief, Mrs. McAlindin and Mr. Stein conspired to present false information to AT&T and to frame their allegations in a fraudulent manner designed and intended to cause AT&T to terminate CSP's Franchise Agreement.

48. Among the false and fraudulent allegations was that Mr. McAlindin was not a person authorized on the McAlindin Wireless Account after August 10, 2009, when in fact there

was nothing to objectively indicate to Mr. Bravo/CSP that Mr. McAlindin had been removed as an authorized person at the time the Account billing records were retrieved on or about September 9, 2009.

49. Among the false and fraudulent allegations by Mrs. McAlindin were, upon information and belief, false and fraudulent assertions that Mr. Bravo/CSP intentionally bypassed security restrictions she had imposed on the Account prior to September 9, 2009, when in fact there were no such security restrictions.

50. Among the false and fraudulent allegations by Mrs. McAlindin were assertions that she had been harmed in some manner by the actions of Mr. Bravo/CSP in accessing the Account billing records, when in fact what Mrs. McAlindin complained of was the embarrassment and harm she had brought upon herself and her marriage by way of her extra-marital affair.

51. By way of a letter dated October 12, 2009, AT&T notified CSP that the Franchise Agreement was terminated immediately due to alleged unauthorized access of the McAlindin Wireless Account which was further alleged to be in violation of 47 U.S.C. § 222, the FCC CPNI Regulations, and alleged to be in breach of the Franchise Agreement.

52. CSP immediately challenged the termination and termination of the Franchise Agreement, and the termination was thereafter suspended and CSP reinstated to an extended date by mutual agreement of the parties to January 12, 2010 so as to allow CSP to explore the potential to sell the business operations to a third-party.

53. The parties thereafter agreed to extend the reinstatement period through February 12, 2010 (Exh. D hereto), and then again through March 12, 2010 (Exh. E hereto).

54. The reasons for the extended reinstatement periods were to allow CSP to pursue the possible sale of the business so as to realize the value of the business.

55. CSP thereafter in January 2010 established a baseline value of the business in a proposed arm's length sale of approximately $359,000, however, the sale did not close when buyers were unable to secure financing for the proposed sale due to personal financial issues.

56. When the first proposed sale did not occur, Defendant Anzalone fraudulently presented himself to the Plaintiffs as a potential purchaser on behalf of TCSI or ABC Corp. -1 in February 2010.

57. Defendant Anzalone had no intention of purchasing the business and his expressed interest was nothing more than a scheme to obtain confidential financial and business information from CSP that he would not have otherwise been able to obtain.

58. Defendant Anzalone desired to obtain CSP's confidential business information in furtherance of an illicit scheme whereby Anzalone would position himself to take over the CSP business, customers, Premises, goodwill, and otherwise present himself or his entity as a functional alter-ego of CSP for the purpose of financial continuity of the business operations.

59. In the course thereof, Defendant Anzalone demanded detailed financial information from CSP under the guise of due diligence for the proposed purchase.

60. In furtherance of the illicit scheme, Anzalone ultimately made the sale negotiations prohibitively difficult and fruitless by proposing terms and conditions that he knew would not be acceptable to the Plaintiffs, and then withdrew from further negotiations.

61. Defendant Anzalone, through either TCSI or ABC Corp. – 1, ultimately took over and occupied the Premises, assumed the financial benefits of servicing CSP customers, marketed the business operations in a manner deliberately designed to mimic the operations of CSP so as

to capitalize and arrogate the goodwill created by CSP over the many years it had operated from the Premises.

62. Defendant Anzalone thereby used the confidential information he obtained from CSP to make the determination to go forward with his illicit scheme and then in furtherance of his illicit scheme in designing the business operations and marketing plans.

63. Defendant Anzalone thereby fraudulently induced CSP to turn over the confidential information and thereafter illicitly utilized the confidential information to arrogate CSP's business, customers, Premises, goodwill and general prospective financial advantages.

**FIRST COUNT**

64. The allegations of this count are directed to Defendant Brian McAlindin.

65. Plaintiffs repeat and reallege all paragraphs set forth herein under the headings "Parties" and "Facts Common To All Counts," as if set forth at length as part of this Count.

66. At the time of his first contact with Mr. Bravo to request the Account billing information, Mr. McAlindin falsely and fraudulently represented to Mr. Bravo that he needed the billing information for reasons other than his true motive, which was to investigate his suspicions of his wife's extra-marital activities.

67. At the time of his initial contacts with Mr. Bravo, Mr. McAlindin had entered into an attorney-client relationship with CSP by advising Mr. Bravo on certain potential claims against AT&T Wireless.

68. By virtue of the circumstances, and Mr. McAlindin's attorney-client relationship with Mr. Bravo, Mr. McAlindin was under a heightened duty to conduct himself fairly and honestly with Mr. Bravo.

69. By misrepresenting the reasons why he wanted billing information for the Account, Mr. McAlindin violated his ethical and legal duties to the Plaintiffs.

70. Mr. McAlindin, by way of affirmative statements and intentional omissions, induced Mr. Bravo to believe that his reasons for wanted the Account billing information were other than his true reasons, and Mr. McAlindin acted with the intent that Mr. Bravo rely thereon.

71. Mr. Bravo did in fact rely on Mr. McAlindin's misrepresentations and omissions to the substantial detriment of the Plaintiffs.

72. The misrepresentations and omissions by Mr. McAlindin were material to Mr. Bravo's subsequent actions in securing the Account billing information.

73. Mr. McAlindin knew, or should have known, that his fraudulent misrepresentations and omissions would potentially put the Plaintiffs in a compromised position in reference to their Franchise Agreement with AT&T.

74. At minimum Mr. McAlindin breached his duties of candor and fair dealing that he owed to the Plaintiffs.

75. The actions by Mr. McAlindin proximately caused substantial detriment to the Plaintiffs including termination of the Franchise Agreement and extended and expensive litigation with AT&T Wireless, and extensive legal costs in attempting to sell CSP.

76. The actions by Brian McAlindin were done with actual malice and intent, and produced emotional distress.

WHEREFORE, Plaintiffs demand judgment against Defendant Brian McAlindin for the following relief:

a. Compensatory damages including legal fees and costs incurred in attempting to sell CSP and in prosecuting the litigation against AT&T Wireless arising from the termination of the Franchise Agreement;

b. Consequential damages;

c. Emotional Distress;

d. Punitive Damages;

e. Legal fees and costs;

f. Such other and further relief as the court may deem equitable and just.

## SECOND COUNT

77. The allegations of this count are directed to Defendants Jori McAlindin and Scott Stein.

78. Plaintiffs repeat and reallege all paragraphs set forth herein under the headings “Parties” and “Facts Common To All Counts,” and all prior Counts, as if set forth at length as part of this Count.

79. The accusations and allegations made by Defendant Jori McAlindin as to the actions of Mr. Bravo and CSP in providing Mr. McAlindin with Account billing records were intentionally false and disparaging.

80. Mrs. McAlindin made the false and disparaging accusations and allegations with the intent to hinder and harm the Plaintiffs and put the business of CSP in a false light.

81. Defendant Stein assisted Mrs. McAlindin in pursuing a common plan and design to commit the tort of false light/injurious falsehood by active participation, aid, or encouragement of the actions taken by Mrs. McAlindin.

82. The actions by Mrs. McAlindin and Defendant Stein proximately caused substantial detriment to the Plaintiffs including termination of the Franchise Agreement and extended and expensive litigation with AT&T Wireless, and extensive legal costs in attempting to sell CSP.

83. The actions by Mrs. McAlindin and Defendant Stein were done with actual malice and intent, and produced emotional distress.

WHEREFORE, Plaintiffs demand judgment, jointly and severally, against Defendants Jori McAlindin and Scott Stein for the following relief:

a. Compensatory damages including legal fees and costs incurred in attempting to sell CSP and in prosecuting the litigation against AT&T Wireless arising from the termination of the Franchise Agreement;
b. Consequential damages;
c. Emotional Distress;
d. Punitive Damages;
e. Legal fees and costs;
f. Such other and further relief as the court may deem equitable and just.

**THIRD COUNT**

84. The allegations of this count are directed to Defendants Jori McAlindin and Scott Stein.

85. Plaintiffs repeat and reallege all paragraphs set forth herein under the headings "Parties" and "Facts Common To All Counts," and all prior Counts, as if set forth at length as part of this Count.

86. The actions by Mrs. McAlindin constituted intentional interference with the Plaintiffs' Franchise Agreement and prospective economic advantages to be derived therefrom.

87. Defendant Stein assisted Mrs. McAlindin in pursuing a common plan or design to commit the torts of tortuous interference with contract and with prospective economic advantage by active participation, aid, or encouragement.

88. The actions by Mrs. McAlindin and Defendant Stein proximately caused substantial detriment to the Plaintiffs including termination of the Franchise Agreement and extended and expensive litigation with AT&T Wireless, and extensive legal costs in attempting to sell CSP.

89. The actions by Mrs. McAlindin and Defendant Stein were done with actual malice and intent, and produced emotional distress.

WHEREFORE, Plaintiffs demand judgment, jointly and severally, against Defendants Jori McAlindin and Scott Stein for the following relief:

a. Compensatory damages including legal fees and costs incurred in attempting to sell CSP and in prosecuting the litigation against AT&T Wireless arising from the termination of the Franchise Agreement;
b. Consequential damages;
c. Emotional Distress;
d. Punitive Damages;
e. Legal fees and costs;
f. Such other and further relief as the court may deem equitable and just.

**FOURTH COUNT**

90. The allegations of this count are directed to Defendants Anzalone, TCSI, and ABC Corp. -1.

91. Plaintiffs repeat and reallege all paragraphs set forth herein under the headings "Parties" and "Facts Common To All Counts," and all prior Counts, as if set forth at length as part of this Count.

92. Defendant Anzalone, acting in his individual capacity as well as on behalf of TCSI and ABC Corp. – 1, intentionally and materially misrepresented his intentions with respect to the purchase of CSP and need to secure the CSP confidential business information and records.

93. The Plaintiffs relied upon Anzalone's fraudulent representations to their detriment in providing the confidential business information which Anzalone/TSCI/ABC Corp. -1 used to their advantage and the disadvantage of the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment, jointly and severally, against Defendants Anzalone, TCSI, and ABC Corp. -1 for the following relief:

a. Compensatory damages including legal fees and costs incurred in attempting to sell CSP and in prosecuting the litigation against AT&T Wireless arising from the termination of the Franchise Agreement;
b. Consequential damages;
c. Emotional Distress;
d. Punitive Damages;
e. Legal fees and costs;
f. Such other and further relief as the court may deem equitable and just.

**FIFTH COUNT**

94. The allegations of this count are directed to all Defendants.

95. Plaintiffs repeat and reallege all paragraphs set forth herein under the headings "Parties" and "Facts Common To All Counts," and all prior Counts, as if set forth at length as part of this Count.

96. The threshold issue upon which the claims revolve is whether the Plaintiffs actions in providing the Account billing records to Mr. McAlindin was consistent with their duties at law under the Communications Act of 1934, 47 U.S.C. § 151, *et. seq.*, and specifically at 47 U.S.C. § 222, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 251 *et. seq.*, and the Customer Proprietary Network Information ("CPNI") Regulations promulgated thereunder by the Federal Communications Commission ("FCC"), in particular by way of the 2007 CPNI Order issued by the FCC, FCC 07-22.

97. Accordingly, the Plaintiffs seek a declaration of the propriety of the actions in conformance with the cited Statutes and Regulations pursuant to the Federal Declaratory Judgment Act 28 U.S.C. § 2201-2202.

WHEREFORE, the Plaintiffs seek judgment adjudicating that none of their actions in reference to the Account billing records contravened the cited Statutes and Regulations, nor was in breach of the terms of the CSP Franchise Agreement with AT&T Wireless.

**JURY DEMAND**

A trial by jury is hereby demanded on claims and counts.

**DESIGNATION OF TRIAL COUNSEL**

Brian F. Curley, Esq. is designated as trial counsel in this matter.

/S/ Brian F. Curley, Esq.

Brian F. Curley, Esq.
Attorney for Plaintiffs

DATED: September 8, 2011